CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 10 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| MERRY CHRISTINE PEASE, )<br>Petitioner, ) | Civil Action No. 7:05CV00538 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| PATRICIA L. HUFFMAN, et al., ) | By: Hon. Glen E. Conrad |
| Respondents. ) | United States District Judge |

Merry Christine Pease, a Virginia inmate proceeding with counsel, filed this action as a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254. The petitioner challenges the validity of her convictions in the Circuit Court for the County of Wise. The petition is presently before the court on the respondent's motion to dismiss. For the reasons set forth below, the court will grant the respondent's motion.

## BACKGROUND

In the spring of 1994, the petitioner was indicted for the November 18, 1993 murder of her husband, Dennis Pease. In August, 1994, a jury convicted the petitioner of second degree murder and use of a firearm in the commission of the murder. The petitioner was sentenced to a total term of imprisonment of twenty-three years, with ten years suspended.

On March 18, 1997, the petitioner's convictions were reversed by the Court of Appeals of Virginia. The Court held that the Commonwealth's Attorney substantially influenced the grand jury's decision to indict the petitioner.

The petitioner was subsequently re-indicted, and the trial court appointed substitute Commonwealth's Attorneys to prosecute the case. Those prosecutors moved to nolle prosequi the indictments, after they discovered a medical examiner's report which ruled the death a suicide. The motion was granted by the trial court.

On August 7, 1998, the trial court appointed Timothy McAfee, the Commonwealth's Attorney at the first trial, to serve as a substitute Commonwealth's Attorney. In December, 1998, a grand jury indicted the petitioner for the third time. Prior to trial, the defense filed a motion to disqualify McAfee and a motion to dismiss the indictment on double jeopardy grounds. Both motions were denied by the trial court. With McAfee prosecuting the case, the petitioner was again convicted of second degree murder and use of a firearm in the commission of the murder. The petitioner was sentenced to twenty-three years in prison, with five years suspended.

The petitioner appealed the convictions to the Court of Appeals of Virginia. The petitioner raised the following claims on direct appeal:

1. The trial court erred in failing to dismiss her indictment on double jeopardy grounds, in that McAfee's misconduct before the first grand jury provided the occasion for the reversal on the earlier appeal.

2. McAfee was disqualified as special prosecutor by the pendency of a bar complaint against him based on his handling of the case, and consequently, the trial court should have disqualified him and dismissed the indictment.

3. The evidence was insufficient to support the convictions.

The Court of Appeals granted Pease's petition for appeal on all three grounds. After full briefing and oral argument, two judges of a three-judge panel found the evidence insufficient to support the petitioner's convictions.[1] The Commonwealth filed a petition for rehearing, which was granted by the Court of Appeals. Upon rehearing en banc, the Court of Appeals affirmed the petitioner's convictions.

---

[1] Those two judges determined that Pease's other claims were without merit.

The petitioner then filed a petition for appeal in the Supreme Court of Virginia. After full briefing and oral argument, the Supreme Court affirmed the petitioner's convictions for the reasons stated by the Court of Appeals.

On August 26, 2004, the petitioner filed a petition for writ of habeas corpus in the Circuit Court for the County of Wise. In that petition, the petitioner raised all but three of the claims that are included in the instant petition.[2] On July 15, 2005, the state habeas petition was dismissed by the Circuit Court. The petitioner did not appeal the dismissal of the petition to the Supreme Court of Virginia.

Pease filed the instant petition on August 30, 2005. The petition includes the following claims:

- A. Prosecutorial Misconduct

    (1) As a result of McAfee's misconduct, Pease was prejudiced by being placed twice in jeopardy for the same offense.

    (2) The appointment of McAfee as special prosecutor failed to comply with Virginia Code § 19.2-255.

    (3) McAfee "vindictively prosecuted" Pease "for purposes of vindicating himself from a pending ethical complaint."

    (4) The actions taken by McAfee were void as a result of non-compliance with Virginia Code § 19.2-155.

    (5) Pease was denied due process and a fair trial as a result of being prosecuted by McAfee.

- B. Ineffective Assistance

    (1) Trial counsel was ineffective for failing to investigate certain witnesses identified by Pease.

---

[2] The petitioner did not raise the following claims in her state habeas petition: claim A(5), claim D, or claim E.

3

>   (2) Trial counsel was ineffective for failing to allow Pease to testify at trial, despite her requests to do so.
>
>   (3) Trial counsel was ineffective for failing to call Marlene Bush as a witness.
>
>   (4) Trial counsel was ineffective for failing to call several forensic experts who would have exonerated Pease.
>
>   (5) As a result of her trial counsel's errors, Pease was deprived of a fair trial.
>
> C. After-discovered Evidence
>
>   (1) Pease has after-discovered opinions from two experts, which would have been available at trial if her trial counsel had fully investigated her defense.
>
>   (2) Counsel was ineffective for failing to discover and call these witnesses.
>
> D.[3] The evidence at trial was insufficient to support Pease's convictions.
>
> E.[4] The Circuit Court failed to provide a full hearing on the merits of Pease's state habeas petition.

On October 3, 2005, the respondent moved to dismiss the petition. Since the petitioner has now responded to the motion, the petition is ripe for review.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254(b), a petitioner challenging a state court conviction must first exhaust remedies available in the courts of the state in which she was convicted before seeking federal habeas review.[5] See Preiser v. Rodriguez, 411 U.S. 475 (1973). When a claim

---

[3] This claim is improperly labeled as claim 10 in the petition.

[4] This claim is improperly labeled as claim 11 in the petition.

[5] The exhaustion requirement is satisfied by seeking review of the claims in the highest state court with jurisdiction to consider the claims. In Virginia, a non-death row inmate can exhaust her state remedies in one of three ways, depending on the nature of the claims she is raising. First, she can file a direct appeal to the Court of Appeals of Virginia, with a subsequent appeal to the Supreme Court of Virginia if the Court of Appeals rules against her. Second, she can attack her conviction collaterally by filing a state habeas petition with the circuit court where she was convicted, with an appeal of an adverse decision to the Supreme Court of

4

Case 7:05-cv-00538-GEC-mfu   Document 14   Filed 02/10/06   Page 4 of 16   Pageid#: 135

has been adjudicated on the merits by a state court, this court may grant habeas relief only if the state court's adjudication of the claims "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law," or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). The United States Supreme Court has explained that this statute "plainly sought to ensure a level of 'deference to the determinations of state courts,' provided those determinations did not conflict with federal law or apply federal law in an unreasonable way." Williams v. Taylor, 529 U.S. 362, 386 (2000) (internal citations omitted). Consequently, "state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." Id. at 389.

## DISCUSSION

A. Procedurally Defaulted Claims

1. Claims A(5) and E

In claim A(5), the petitioner alleges that she was denied due process and a fair trial as a result of being prosecuted by McAfee. In claim E, the petitioner alleges that the Circuit Court erred by failing to provide a hearing on the merits of her state habeas petition. Neither claim was presented as part of any state court proceeding. If the petitioner now attempted to present claim A(5) in a state habeas petition, the claim would be barred by Va. Code §§ 8.01-654(A)(2)[6] and

---

Virginia. See Va. Code § 8.01-654. Finally, she can exhaust his remedies by filing a state habeas petition directly with the Supreme Court of Virginia. Id. Whichever route the inmate chooses to follow, it is clear that she must ultimately present her claims to the Supreme Court of Virginia and receive a ruling from that court before a federal district court can consider them. See O'Sullivan v. Boerckel, 526 U.S. 828, 845 (1999).

[6] Section 8.01-654(A)(2) provides, in pertinent part, that a "habeas corpus petition attacking a criminal conviction or sentence," except as provided in capital cases, "shall be filed within two years from the date of final judgment in the trial court or within one year from either final disposition of the direct appeal in state court or the time for filing such appeal has expired, whichever is later." Va. Code § 8.01-654(A)(2).

5

8.01-654(B)(2)[7]. If the petitioner now attempted to present Claim E, which could only be litigated by direct appeal from the Circuit Court's dismissal of the petitioner's state habeas petition, the claim would be barred by Rule 5:9(a)[8] of the Rules of the Supreme Court of Virginia. Thus, claim A(5) and claim E are procedurally defaulted. See Weeks v. Angelone, 176 F.3d 249, 273-274 (4th Cir. 1999); Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir. 1998); Coleman v. Thompson, 895 F.2d 139, 143 (4th Cir. 1990). As a result, the court may not review these claims absent a showing of cause and prejudice or actual innocence. See Murray v. Carrier, 477 U.S. 478, 496 (1986); Sawyer v. Whitley, 112 S. Ct. 2514, 2517 (1992). Because the petitioner does not attempt to establish cause and prejudice or actual innocence to excuse the procedural default, claims A(5) and E must be dismissed.

2.   Claims A(2), A(4), B(1) through B(5), C(1), and C(2)

These nine claims were presented only in the petitioner's state habeas petition, which was dismissed by the Circuit Court. Since the petitioner did not appeal the dismissal of the state habeas petition to the Supreme Court of Virginia, the petitioner failed to fully exhaust her state court remedies as to these claims. If the petitioner now attempted to appeal the dismissal of the petition, the appeal would be dismissed as untimely. See Va. S. Ct. R. Rule 5:9. As such, these claims are procedurally defaulted. See Coleman, 895 F.2d at 143. Since the petitioner has not

---

[7] Section 8.01-654(B)(2) provides, in pertinent part, that "[n]o writ shall be granted on the basis of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition." Va. Code § 8.01-654(B)(2).

[8] This rule provides that "[n]o appeal shall be allowed unless, within 30 days after the entry of final judgment or other appealable order or decree, counsel for the appellant files with the clerk of the trial court a notice of appeal and at the same time mails or delivers a copy of such notice to all opposing counsel." As previously stated, the petitioner did not appeal the dismissal of her state habeas petition to the Supreme Court of Virginia, and the thirty-day period has expired.

6

attempted to establish cause and prejudice or actual innocence to excuse the procedural default, these nine claims must be dismissed.

### 3. Claim A(3)

In claim A(3), the petitioner alleges that Timothy McAfee "vindictively prosecuted" her "for purposes of vindicating himself from a pending ethical complaint." The court agrees with the respondent that this claim was not properly preserved as a federal constitutional claim, when it was presented to the state courts. Although the petitioner raised the same claim on direct appeal, the petitioner failed to explain how McAfee's actions established a violation of her constitutional rights.

In order to satisfy the exhaustion requirement, a petitioner "must 'fairly present' [her] claim in each appropriate state court, thereby alerting that court to the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (internal citations omitted). Although a petitioner need not "cite book and verse on the federal constitution" in order to satisfy the exhaustion requirement, the federal claim nevertheless must be "fairly presented" in state court. Picard v. Connor, 404 U.S. 270, 275 (1971) (internal quotation marks omitted). As the United States Court of Appeals for the Fourth Circuit explained in Mallory v. Smith, 27 F.3d 991 (1994), "the ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." Mallory, 27 F.3d at 995. Applying these principles to the plaintiff's claim, the court concludes that the claim was not fairly presented in state court, and thus, that the claim is unexhausted.

If the petitioner now attempted to present the claim in a state habeas petition, the claim would be barred by Virginia Code §§ 8.01-654(A)(2) and (B)(2). Therefore, the claim is

procedurally defaulted absent a showing of cause and prejudice or actual innocence. Since the petitioner has not made either showing, claim A(3) must be dismissed.[9]

B. Exhausted Claims

1. Claim A(1)

In claim A(1), the petitioner alleges that she was subjected to double jeopardy. Specifically, the petitioner alleges that because her first conviction was reversed as a result of McAfee's misconduct, she should not have been retried for the same offenses. This claim was presented on direct appeal. The state appellate courts concluded that the claim was without merit, because there "was nothing to indicate the prosecutor intended to delay the trial or to goad the defendant into asking for a mistrial." See Pease v. Commonwealth 39 Va. App. 342, 348, 573 S.E.2d 272, 274-275 (Va. Ct. App. 2000).

Having reviewed the petitioner's allegations, the court concludes that the state appellate courts' decision did not involve an unreasonable application of clearly established federal law or an unreasonable determination of the facts. It is well established that the Double Jeopardy Clause generally "does not prevent the government from retrying a defendant who succeeds in getting his first conviction [reversed] because of some error in the proceedings leading to conviction." Lockhart v. Nelson, 488 U.S. 33, 38 (1988). Although prosecutorial misconduct may give rise to a double jeopardy violation if the "conduct in question is intended to 'goad' the

---

[9] In any event, the court concludes that the state appellate courts's decision with respect to this claim was not unreasonable. The record supports the conclusion that McAfee had no personal interest in the outcome of the case. Although the Virginia State Bar was investigating two ethical complaints arising from McAfee's conduct during the first trial at the time he was appointed to serve as a substitute Commonwealth's attorney in the second trial, Richard Slaney, an attorney with the Virginia State Bar, testified at an evidentiary hearing that McAfee's involvement in the case would have no effect on the disciplinary proceedings. (Feb. 3, 2000 Tr. 70). Likewise, Slaney testified that the outcome of the criminal case would have no effect on the outcome of the disciplinary proceedings. (Tr. 70). Moreover, Slaney testified that a complaint against a prosecutor by a criminal defendant does not generally disqualify the prosecutor from a criminal case. (Tr. 79).

8

defendant into moving for a mistrial," Oregon v. Kennedy, 465 U.S. 667, 676 (1982), there is simply no evidence of such misconduct in this case. Accordingly, the court concludes that claim A(1) must be dismissed.

2. Claim D

In Claim D, the petitioner argues that the evidence was insufficient to support her conviction for second degree murder. To establish the crime of second degree murder under Virginia law, "the defendant must be shown to have wilfully [sic] or purposefully, rather than negligently, embarked upon a course of wrongful conduct likely to cause death or great bodily harm." Essex v. Commonwealth, 228 Va. 273, 280-81, 322 S.E.2d 216, 220 (1984).

When reviewing the sufficiency of the evidence to support a conviction, the critical inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). The court must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). The court does not weigh the evidence or consider the credibility of witnesses. United States v. Arrington, 719 F.2d 701, 704 (4th Cir. 1983). Applying these principles to this case, the court concludes that any rational trier of fact could have found the essential elements of the crime at issue beyond a reasonable doubt.

The evidence at trial revealed that Dennis Pease worked the "hoot owl" shift, from midnight to 8:00 a.m., at Westmoreland Coal Company. (Trial Tr. 556). On the morning of November 18, 1993, Dennis mentioned to a co-worker that he was afraid that his wife might be having an affair, and that he thought "something was going to happen real soon." (Tr. 556-557).

9

Dennis's co-worker told him that he had once suspected that his own wife was having an affair, and that he had taken the coil wire off of his wife's car in an attempt to make her stay at home. (Tr. 568-569).

That same day at approximately 4:00 p.m., the petitioner appeared at the residence of her neighbor, Rick Salyers, who worked as a police officer in Big Stone Gap. (Tr. 591-592). The petitioner said that she had been shot and that she needed help. (Tr. 595). When asked who had shot her, the petitioner said that she had been shot by Dennis. (Tr. 595). Salyers immediately called 911, retrieved his service revolver, and stood in a position in which he could talk to the petitioner and observe the petitioner's house. (Tr. at 595-597). Salyers observed a wound on the left side of the petitioner's abdomen, which was "oozing" moisture, and a powder burn on her shirt. (Tr. 597-598).

The petitioner told Salyers and his wife that she and Dennis had been arguing. (Tr. 598). The petitioner explained that when she knocked on their bedroom door in an attempt to get Dennis to come out, Dennis jerked open the door, pointed the gun at her, and shot her at close range. (Tr. 598). Upon being shot, the petitioner ran outside for help. (Tr. 608). The petitioner told Salyers that she was unable to use her car, because Dennis had done something to disable it. (Tr. 608). The petitioner stated that she may have heard another shot from her house when she ran out, but she was not sure. (Tr. 604-605).

Salyers noticed a powder burn on the edge of the petitioner's right hand, which ran from her wrist to the first knuckle on her little finger. (Tr. 600). Salyers asked the petitioner if she had shot the gun, and she said that she had not touched it. (Tr. 600). Specifically, the petitioner said "I didn't touch the gun. He shot me and I ran." (Tr. 600). After being asked about the powder burn, the petitioner attempted to wash the burn off her hand. (Tr. 601).

10

While the petitioner was at his house, Salyers kept watch on the petitioner's residence. Salyers did not see any movement. (Tr. 602). As they waited for medical assistance to arrive, the petitioner commented to Salyers's wife that she "did it all for [her children from a prior marriage] Chris and Ketzie." (Tr. 604). She also stated that she was "all that Chris and Ketzie has [sic] now." (Tr. 606). However, before the petitioner was transported to the hospital, no one had told her that Dennis was dead. (Tr. 622).

After the petitioner was transported to the hospital, Salyers and two other deputies entered the petitioner's residence and found Dennis dead in the living room. (Tr. 624). He was lying on the floor with his head toward the door and blood running down his back. (Tr. 624). After ascertaining whether Dennis was dead, the officers went outside and secured the trailer until crime scene technicians could arrive. (Tr 625-627).

Investigators Darnell and Robinson were sent to the hospital to obtain swabs from the petitioner for a gunshot residue test, and to see if the petitioner would provide a statement. (Tr. 681-682, 1021-1022). The investigators spoke with the petitioner in the emergency room at 5:55 p.m., and took swabs from her hands and face. (Tr. 683-684). The investigators, like Salyers, noticed the powder burn on the edge of the petitioner's right hand. (Tr. 683, 1025).

The petitioner told the investigators that she and Dennis had been arguing for a couple of weeks, that Dennis had taken her checkbook, and that he had disabled her car. (Tr. 1036). The petitioner explained that she went to the bedroom door and asked Dennis what was wrong with the car. (Tr. 1037). She then turned and walked away from the door. (Tr. 1037). The petitioner told the investigators was standing near a chair at the kitchen table when Dennis opened the door and shot her in the abdomen. (Tr. 1037). The petitioner estimated that she was standing approximately five to eight feet from Dennis at the time she was shot. (Tr. 1039). The petitioner

11

also told the investigators that Dennis came toward her, brandishing the pistol, that she begged him not to kill her, and that she jerked away from him and ran from the residence for help. (Tr. 1037). The investigators took the petitioner's shoes and shorts for forensic testing. (Tr.1015-1017, 1023).

A trace evidence expert testified that he analyzed the gunshot residue swabs from Pease as well as the gunshot residue swabs from Dennis's hands. The expert found primer residue on Dennis's hands and on the petitioner's right hand and face, as well as particles indicative of primer residue on the petitioner's left hand. (Tr. 832). Such findings indicated that each of them had either fired the weapon or stood in close proximity to the weapon when it was fired, or that each of them had handled a dirty weapon or cartridge cases. (Tr. 823). However, the expert could not determine which of the individuals had fired the weapon. (Tr. 831).

Another forensic scientist testified that she had found and analyzed blood on the left side of the petitioner's left shoe. DNA testing detected elements that were consistent with the petitioner's blood, as well as elements that were consistent with Dennis's blood. (Tr. 844). However, the forensic scientist could not affirmatively state that the elements that were inconsistent with the petitioner's blood had come from Dennis. (Tr. 844).

A third forensic scientist, who had examined the gunpowder burn around the hole in the petitioner's sweatshirt, concluded that the muzzle of the weapon had either been touching the shirt's fabric or was within one inch of the fabric at the time of firing. (Tr. 1054, 1056-1057). The scientist testified that most guns stop leaving visible residue from eighteen to twenty-four inches, and that it would have been impossible for the shot to have caused such a burn if the shot had been fired from as far away as three feet. (Tr. 1058). The scientist also testified that it was

12

impossible for the petitioner to have received the powder burn on her right hand from merely touching the gun while it was not firing. (Tr. 1097).

The medical examiner testified that Dennis died from two gunshot wounds to his chest. (Tr. 1423). One shot penetrated his right lung and exited through his back. (Tr. 1423). The second shot penetrated Dennis's heart. (Tr. 1438). Both wounds were "loose contact" wounds, meaning that the gun's muzzle was either touching the skin or was within one-eighth of an inch from the skin. (Tr. 1428). The medical examiner opined that such wounds were consistent with both suicide and homicide. (Tr. 1428, 1437).

The crime scene revealed a great deal of forensic evidence. The master bedroom showed signs of a struggle, in that a window blind had been torn down and demolished, and feathers from a burst pillow were strewn across the room. (Tr. 720-721, 755). Feathers were found in Dennis's shoes, which were located in a second bedroom, as well as around his body. (Tr. 717, 772). The second bedroom also contained an overturned desk. (Tr. 718).

A trail of blood was found on the floor leading from the master bedroom to the kitchen, and from the kitchen to the living room. (Tr. 703, 734-735, 737). A blood splatter expert testified that the main trail indicated that whoever left the blood had been traveling rather slowly, but that another series of drops suggested that they had been rapidly cast off, as if someone held in their hand an object with excess blood on it and moved it in a quick manner. (Tr. 1124-1125, 1127-1128). All of the blood belonged to Dennis. (Tr. 742-743). Investigators found a blonde hair near the surface of a pool of blood beneath the victim's body. (Tr. 696). Forensic testing revealed that the hair came from the petitioner. (Tr. 745, 859-860).

Investigators found a .357 caliber revolver on the floor near Dennis's right hand. (Tr. 693). Ballistic testing revealed that the revolver fired the fatal shots. Although the victim's

hands had an extensive amount of blood on them, (Tr. 799, 883), the revolver had no blood on it. (Tr. 715, 883). Likewise, the blood on Dennis's hands did not contain an imprint of the gun. (Tr. 884). A police evidence technician testified that if the victim had shot himself, the technician would have expected to find blood from the victim's hands on the gun, especially after the petitioner had suffered one wound. (Tr. 715-716).

After interviewing the petitioner, Investigators Darnell and Robinson returned to the crime scene and advised the other investigators what the petitioner had said about how and where she was shot. Although the investigators spent hours searching the area of the trailer in which the petitioner claimed to have been shot, including the kitchen window and windowsill, the investigators found no other bullets or bullet holes in that particular area. (Tr. 748-749, 781, 798, 877-878, 919-921, 1027-1033, 1169-1173). Instead, the investigators discovered a bullet hole in the kitchen wall, which penetrated through to the laundry room and landed on an ironing board. (Tr. 691-692, 706, 736-737. Dennis's unlocked pickup truck was located outside the trailer. The police found a loaded .38 caliber revolver in the truck's glove compartment. (Tr. 884-885).

On November 19, 1993, the day after the shootings, Detective Mullins and Special Agent Parker of the Virginia State Police interviewed the petitioner at the hospital. The petitioner told the officers that she and Dennis had been arguing for two weeks about money. (Tr. 1177). The petitioner explained that she went to the bedroom door because Dennis had done something to her car. (Tr. 1175). After the petitioner knocked on the door and asked about the car, Dennis shot her from the bedroom doorway, while she was standing six to eight feet away, near the kitchen table. (Tr. 886-887, 888-889, 1173-1175). The petitioner claimed that Dennis then followed her into the kitchen, where she grabbed his arms, raised his hands, and begged him not to shoot her again. (Tr. 887). When asked whether she grabbed the gun in his hands, the

14

petitioner said that she had grabbed Dennis's arms instead. (Tr. 887-888, 1176). The petitioner also stated that she might have heard another shot as she escaped the residence. (Tr. 935).

Investigator Mullins visited the petitioner in her home on December 1, 1993. The investigator told the petitioner that the police could not close the case as a suicide because they were unable to find the bullet that injured her. (Tr. 889-890). On this occasion, the petitioner stated that she did not hear any shots when she left the residence. (Tr. 891).

A few days later, Mullins received instructions to go to the petitioner's home to "pick up a bullet." (Tr. 892). Upon his arrival, the petitioner took him to the kitchen, pulled back the curtains over the window, and showed him a .38 caliber bullet lying on the windowsill. (Tr. 892). Mullins and three other officers testified that they had checked that windowsill when they searched the trailer on November 18th and 19th, and that no bullet was found. (Tr. 748-749, 880, 893, 1033, 1171-1173). Ballistics testing revealed that the bullet had been fired from the revolver found near the victim's body. (Tr. 922).

Police officers interviewed the petitioner again on January 6, 1994. At that time, the petitioner told them that she had hidden the revolver from which the shots were fired beneath the corner of a dresser in the bedroom. (Tr. 1271). The petitioner did not indicate that she had told her husband where the gun was hidden. (Tr. 1271).

In the summer of 1994, Investigator Robinson showed the petitioner photographs from the crime scene, including those of her husband's dead body. In response, the petitioner giggled and laughed. (Tr. 1034, 1062). The petitioner was also present during a conversation between police officers and the medical examiner in August, 1994. When the medical examiner was asked whether the victim had experienced pain from the first wound, the petitioner spontaneously answered, "a lot." (Tr. 1271-1272). Finally, the Commonwealth presented evidence at trial

15

regarding the financial gains that the petitioner stood to realize as a result of Dennis's death. (Tr. 1229-1260, 1486).

When viewed in the light most favorable to the Commonwealth, the court agrees with the respondent that the evidence is sufficient to support the petitioner's conviction for second degree murder. Based on the evidence presented at trial and the inconsistent statements made by the petitioner, <u>any</u> rational trier of fact could have disbelieved the petitioner's story and concluded that she intentionally shot her husband. Accordingly, the court concludes that claim D must be dismissed.

## CONCLUSION

For the reasons stated, the court will grant the respondent's motion to dismiss. The Clerk is directed to send certified copies of this opinion and the accompanying order to the petitioner and all counsel of record.

ENTER: This 9th day of February, 2006.

_____
United States District Judge